IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*FILED*

*NOV 06 2009*

*U.S. DISTRICT COURT*
*CLARKSBURG, WV 26301*

MARY PATRICIA PROESCHER,

    Plaintiff,

v.
                                  Civil Action No. 1:08CV214
                                  (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social

Security Administration ("Defendant," and sometimes "the Commissioner") denying the Plaintiff's

claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter

is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Mary Patricia Proescher ("Plaintiff") filed an application for DIB on November 30, 2004,

alleging disability since July 11, 2004, due to Lyme disease, irritable bowel syndrome, chronic

fatigue syndrome, fibromyalgia, and depression (R. 23). Plaintiff's applications were denied at the

initial and reconsideration levels (R. 39, 41, 49). Plaintiff requested a hearing, which Administrative

Law Judge Frances P. Kuperman ("ALJ") held on October 10, 2007. Plaintiff, represented by

counsel, testified on her own behalf. Also testifying was Vocational Expert Karen Vandyk ("VE")

(R. 234-58). On May 23, 2007, the ALJ entered a decision finding Plaintiff was not disabled (R. 23-

31). On October 8, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-9).

## II. FACTS

Plaintiff was forty-six years, ten months old on the day she alleged she became disabled (R. 23, 237). She graduated from high school (R. 237). Her past relevant work included cafeteria manager, owner/operator of a store, substitute teacher, and foster parent (R. 255).

On December 23, 2003, Dr. Shaw examined Plaintiff at the request of Dr. Levickas, Plaintiff's treating physician. He noted she had been found to be positive of Lyme disease. Plaintiff stated she had been treated for Lyme disease "but did not get better." Plaintiff reported chronic fatigue, "shooting pain in her left leg, pain in the posterior aspect of both knees, and total body general musculoskeletal pain every day." Plaintiff had no weight loss, no morning stiffness, no muscle weakness, no warmth or redness of her joints, and no low back pain (R. 212). Plaintiff's articular examination revealed full range with no signs of acute or chronic synovitis; her neck was supple; she had no clubbing, cyanosis, or edema; her neurologic examination was nonfocal. Dr. Shaw opined the "differential diagnosis include[d] lupus, RA, Sjögren's syndrome . . . . vasculitis, TB, . . . Lyme disease . . ., parvovirus B19, or occult tumors." Dr. Shaw ordered laboratory tests, instructed Plaintiff to continue taking her current medications, and instructed Plaintiff to return in three weeks so he could "perhaps offer her a more definitive diagnosis" (R. 213).

On January 20, 2004, Dr. Shaw provided a rheumatologic consultation follow-up note to Dr. Levickas. Plaintiff reported she felt better, had increased energy, and less joint pain and stiffness. She was medicating with Amitriptyline. She had no shortness of breath, no abdominal pain, no weight or appetite variations, normal blood pressure, supple neck, and no clubbing, cyanosis or

2

edema. Plaintiff's articular examination revealed full range and no "signs of acute or chronic synovitis." Dr. Shaw found no "true evidence of an inflammatory arthropathy or CTD despite the positivity of her SSA and double-stranded DNA." He opined Plaintiff's "trend [was] improvement," and that she should be "clinically observe[d] . . . in that regard" (R. 201).

On January 22, 2004, a CT scan was made of Plaintiff's abdomen. It was unremarkable. On that same date, a CT scan was made of Plaintiff's pelvis; it, too, was unremarkable (R. 165).

On February 25, 2004, Dr. Levickas opined Plaintiff could stand/walk for three-to-five hours in an eight-hour work day; sit for three-to-five hours in an eight-hour workday; and could drive, within a three-to-five mile radius for three-to-five hours in an eight-hour workday. Dr. Levickas opined Plaintiff could frequently lift zero to ten pounds; occasionally lift ten to twenty pounds, and never lift twenty to fifty pounds or more than fifty pounds. Dr. Levickas found Plaintiff could occasionally carry zero to ten pounds and ten to twenty pounds and never carry twenty to fifty pounds or more than fifty pounds. Dr. Levickas opined Plaintiff could frequently bend, squat, climb, kneel, twist, push, pull, reach, and stand. Dr. Levickas opined that Plaintiff could use her hands for gross grasping and fine manipulation and that she could reach above her shoulders. Dr. Levickas found Plaintiff capable of light work, which was for lifting twenty pounds maximum with frequency, carrying objects weighing up to ten pounds with frequency, sitting most of the time, and a "degree" of pushing/pulling of arm and/or leg controls (R. 119).

On March 16, 2004, Dr. Shaw corresponded with Dr. Levickas that Plaintiff presented "with worsening fatigue, nausea, weakness, occasional sweats, and bruising behind her knees and ankles and under her axilla." Dr. Shaw wrote that he did not "have a full explanation as to why she is experiencing all that she is" because she had no shortness of breath, no decreased weight or appetite,

no synovitis, no clubbing, no edema, no lymphadenopathy. He found Plaintiff physical exam to be "generally normal . . . but with clear laboratory abnormalities." He wrote that he did not know if he was "dealing with occult Lyme disease vs. an occult connective tissue process" or "occult neoplasia and infection . . . ." Dr. Shaw noted Plaintiff's CBC and chem. 20 [were] normal; Lyme titer by Western blot is positive for IgM and negative of IgG; ANA is low positive with a positive double-stranded DNA Smith autoantibody, RNP, and SSA; TFTs and RF are negative; c- and p-ANCA are negative; complement studies and CPK are normal. Dr. Shaw suggested Plaintiff return to Dr. Landrum, who specialized in infectious disease to "see whether he [could] sort out some of these abnormalities" (R. 198).

On April 14, 2004, Plaintiff underwent a fluoro-guided lumbar puncture for severe fatigue and Lyme disease (R. 164). Dr. Petri opined the results of this test were normal (R. 125).

On June 7, 2004, Plaintiff was evaluated for systemic lupus erythematosus by Dr. Petri (R. 125). Plaintiff informed Dr. Petri that she had lost fifteen pounds in January, 2004; difficulty sleeping; "some seborrheic keratoses; "red spots on her right shoulder"; frequent canker sores in her mouth; occasional difficulty swallowing; intermittent shortness of breath; occasional foot edema; "blue-purple color of her fingers on cold exposure"; intermittent right arm tingling; occasional numbness; headaches and intermittent weakness on left side; and pain on left side, which started at chest and radiated to left neck and ear. Plaintiff stated she medicated with Ultracet, Naproxen, Effexor, and Cyclobenzaprine.

Dr. Petri's examination of Plaintiff showed no thrush, no mouth ulcers, chest clear to auscultation, regular heart rate and rhythm, nontender abdomen, no hepatosphlenomegaly, no clubbing, no cyanosis, no edema, and no joint synovitis. Dr. Petri noted Plaintiff had "characteristic

fibromyalgia tender points" (R. 126).

Dr. Petri diagnosed fibromyalgia. She noted Plaintiff's "examination is most consistent with fibromyalgia" and that "if she truly had Lyme disease that we had seen Lyme disease followed by fibromyalgia." Dr. Petri instructed Plaintiff to continue medicating with Ultracet, Effexor, and Naproxen, and to participate in a "stretching regimen such as Tai Chi" and to engage in "some aerobic exercises . . . on a daily basis" (R. 126). Dr. Petri found Plaintiff did not meet the criteria for a diagnosis of lupus (R. 127).

On June 8, 2004, Plaintiff's lab results showed she was negative for Lyme disease (R. 132).

On March 2, 2005, Dr. Thomas Lauderman, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 167). Dr. Lauderman found Plaintiff had no postural, manipulative, visual, environmental, or communication limitations (R. 168-70). Dr. Lauderman noted Plaintiff was capable of caring for herself, did household chores, prepared meals, shopped, took "part in school events," walked three-hundred feet before stopping to rest, and went outside daily. Dr. Lauderman noted Plaintiff did not medicate for depression. He found Plaintiff to be partially credible (R. 171).

On April 1, 2005, Dr. Henry Scovern reviewed and agreed with Dr. Lauderman's March 2, 2005 findings (R. 188). Dr. Scovern also noted that Plaintiff had "presented with nonspecific complaints of fatigue, achiness, etc. An extensive evaluation for connective tissue disease was . . . essentially negative when combined with the absence of suggestive clinical features." He noted Plaintiff may have had Lyme disease, but had received "adequate treatment and there [was] no

5

indication of active Borreliosis." Dr. Scovern found that Plaintiff had been diagnosed with fibromyalgia, the "work impact of . . . such . . . [was] judged to a large extent on the basis of subjective allegations," but that her "ADLs [were] extensive and indicated the ability to accomplish a lot most days" (R. 190).

On May 16, 2005, Dr. Shaw corresponded with Dr. Levickas. He wrote that Plaintiff had "arthralgias and myalgias." Dr. Shaw noted Plaintiff felt "well." She had no shortness of breath, abdominal pain, appetite changes, sicca features, Reynaud's phenomenon, mouth sores, or rashes. Dr. Shaw opined Plaintiff had "full range with no sign of acute or chronic synovitis." Her neck was supple and without JVD, thyromegaly or bruits. Plaintiff had no clubbing or edema. Her neurological exam was found to be "nonfocal." Dr. Shaw's impression was for arthralgias, myalgias, fatigue, and "nonspecific memory loss." Dr. Shaw instructed Plaintiff to medicate her fibromyalgia with "muscle relaxants, antidepressants, counseling" and physical therapy (R. 194).

On October 12, 2005, Dr. Fulvio Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff based on the primary diagnoses of Lyme disease and chronic fatigue syndrome, the secondary diagnosis of irritable bowel syndrome, and the other alleged impairment of mild anemia (R. 214). Dr. Franyutti found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 215). Dr. Franyutti found Plaintiff could frequently balance, stoop, kneel, crouch, and crawl. He found Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds (R. 216). Dr. Franyutti found Plaintiff had no manipulative, visual or communicative limitations (R. 217-18). Dr. Franyutti found Plaintiff could

experience unlimited exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, and hazards (R. 218). Dr. Franyutti found Plaintiff was partially credible; he found Plaintiff's allegations were partially supported by the findings. He noted her ADL's supported a reduced RFC to medium (R. 219).

On November 11, 2005, Dr. Levickas wrote a letter, addressed "To Whom It May Concern." In that letter, he noted Plaintiff had been diagnosed with fibromyalgia. He wrote Plaintiff had "considerable fatigue, myalgias, headaches, concentration difficulties, . . . generalized weakness." He noted Plaintiff's "extensive workup for infectious connective tissue disorder negative." He opined Plaintiff was "debilitated & disabled from her symptoms." Dr. Levickas wrote there was "no definitive objective diagnosis test" for fibromyalgia (R. 222).

On July 5, 2006, Plaintiff was treated at the University of Maryland Neurology Ambulatory Center. The reason for her visit was "MRI findings of possible MS." She reported she was being treated for hypertension, extreme fatigue, weakness, pain, anxiety, depression, nerve sensation pain, skin rashes, poor concentration, poor memory, Reynaud's Syndrome, impaired balance, blurred vision, and clogged ears. No diagnosis was made (R. 223-26).

On October 9, 2006, Dr. Levickas wrote a letter, titled, "To Whom it May Concern," wherein he wrote that Plaintiff had "several symptoms, including fatigue, myalgias, numbness, tingling." Dr. Levickas wrote Plaintiff had been unable to work since November, 2003, due to her symptoms. Dr. Levickas wrote that Plaintiff "had undergone extensive evaluation with no clear diagnosis at this point." He noted she had been diagnosed with Lyme disease and that "treatment failed to improve her symptoms." Dr. Levickas also noted she had undergone an "evaluation for rheumatologic

condition, including SLE, but work up did not give diagnosis except fibromyalgia." Dr. Levickas wrote that a recent "MRI of head" was "suspicious of MS, but definitive diagnosis has not yet been made." Dr. Levickas noted she was being treated at the University of Maryland Medical Center. Dr. Levickas opined Plaintiff was "markedly symptomatic" and that he could "foresee her disability . . . . last[ing] indefinitely" (R. 227).

On October 16, 2006, a radiologic study was made of Plaintiff. It was a "stable study with rotatory levoscoliosis." The test showed no "HNP or critical stenosis." There were "[m]ultilevel degenerative disc changes with a stable asymmetric disc bulge into the inferior left neural foramen at L4-L5 without nerve root impingement" (R. 228).

Administrative Hearing

At the October 10, 2006, administrative hearing, Plaintiff testified she drove "here and there sometimes" because, when she drove "a distance," she felt like she was "wakening up out of like an anesthesia type thing or something" (R. 238).

Plaintiff testified she had "trouble with this right arm," in that it became numb and tingled. Plaintiff stated her "whole insides . . . [were] jittering or shaking." Plaintiff stated she felt frustrated because she felt as if she were ninety years old and not fifty years old. Plaintiff testified she was depressed because she was "young and yet [could not] . . . do the things that [she] used to do" (R. 250). Plaintiff testified she had difficulty with her memory when she tried to communicate or remember tasks she had to complete (R. 249).

Plaintiff testified she stopped working in June, 2004, because she was "extremely tired, weak and like just sick, throwing up" (R. 239). Plaintiff reported she was the cashier, prepped food, cooked food, did banking, and served food at a middle school cafeteria. Plaintiff reported she

supervised one other person from August, 1999, to December, 2003 (R. 239-40).  Plaintiff then went on sick leave, and, when she returned, she worked as an assistant to the assistant cook, in which position she worked four hours daily and placed small amounts of food in pans but did not lift heavy objects (R. 241).  Plaintiff testified that during the time she was assistant to the assistant cook, which was from March, 2004, to June, 2004, she was absent approximately ten days.  Plaintiff stated she "pushed" herself to work her four hours per day because she thought working would "help [her] feel better" (R. 242).  Plaintiff testified she was a foster parent until 2003, when "they closed the home" and her illness prevented her from continuing that activity (R. 244).  Plaintiff had fostered sixty to sixty-five children during the time period that she was a foster parent (R. 253).

Plaintiff testified her severe tiredness had worsened since she stopped working in 2004.  She stated she could not get out of bed on some mornings and had to lie down one-half hour after she did get out of bed on other mornings.  Plaintiff testified her fatigue was so severe, she had difficulty showering one morning (R. 246).  Plaintiff stated her hands "gt real, real cold[,] tur[ed] white [at the fingernail]," and went "numb" because of Reynaud's disease (R. 247). Plaintiff testified she experienced these symptoms five out of seven days per week for twenty minutes to "hours" per episode.  Plaintiff testified her fatigue was constant, and she napped a couple hours per day (R. 248).

The ALJ asked the VE the following hypothetical question: "Assume an individual with the Claimant's vocational profile, along with assuming that she can do sedentary work but should avoid concentrated exposure to extreme heat, cold and vibration.  Would she be able to do any work?"  The VE replied that Plaintiff could perform the work of credit clerk, which was a sedentary, unskilled occupation, and of which 225 positions existed in the regional economy and 11,045 positions existed in the national economy.  The VE testified that Plaintiff could perform the work of information clerk,

which was a sedentary, unskilled occupation, and of which there were 2,014 positions in the regional economy and 93,015 positions in the national economy. Plaintiff, according to the VE, could perform the work of an interviewer, which was an unskilled, sedentary occupation, and of which 2,660 positions existed in the regional economy and 38,117 positions in the national economy (R. 256). The ALJ asked the VE if Plaintiff would be able to work if she found Plaintiff's testimony fully credible; the VE responded she would not (R. 257).

Evidence to Appeals Council

The letter, dated October 9, 2006, and addressed "To Whom it May Concern," written by Dr. Levickas, and part of the record before the ALJ prior to her rendering her decision and considered by her in making her decision, was submitted to the Appeals Council on August 20, 2007 (R. 233).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Kuperman made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009 (R. 25).

2.  The claimant has not engaged in substantial gainful activity since June 11, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.) (R. 25).

3.  The claimant has the following severe impairments: fibromyalgia and multilevel degenerative disc disease (20 CFR 404.1520(c)). There is no mental impairment (R. 25).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work and avoid concentrated extremes of heat and cold as well as vibration (R. 26).

5.  The claimant is unable to perform any past relevant work (20 CFR 404.1565) (30).

6.      The claimant was born on July 17, 1957 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged onset date (20 CFR 404.1563) (30).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.564) (30).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 30).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566) (R. 31).

10.     The claimant has not been under a disability, as defined in the Social Security Act, from June 11, 2004 through the date of this decision (R. 20 CFR 404.1520(g)) (R. 31).

## IV.  DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit held, "Our scope of review is specific and narrow.  We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit

has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.      The ALJ "completely ignored the opinion of her long-time treating physician . . . ."; the opinion of Plaintiff's treating physician "should be given controlling weight . . ." (Plaintiff's brief at pp. 13-14).

2.      The ALJ "failed to evaluate the Plaintiff's complaints of pain " (Plaintiff's brief at p. 16).

The Commissioner contends:

1.      The medical evidence indicates that Plaintiff has the residual functional capacity (RFC) to perform the jobs identified by the VE.

## C. Treating Physician

Plaintiff contends the ALJ failed to "ascribe any weight" to the opinion of the treating physician (Plaintiff's brief at p. 15) and that the ALJ failed "to state any reasoning as to why she seemed to reject the opinion of the treating physician" (Plaintiff's brief at p. 14). Defendant asserts the ALJ evaluated all the evidence, "including the opinion of Dr. Levickas," Plaintiff's treating physician (Defendant's brief at p. 6).

SSR 96-2p mandates the following:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1. The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.

Dr. Levickas treated Plaintiff for her complaints related to fatigue, myalgias, numbness and tingling. He referred her to other doctors for evaluations and he wrote letters regarding her limitations and ability to work.

The ALJ noted the following as to the opinions of Dr. Levickas, Plaintiff's treating physician:

As for the opinion evidence, in a report dated October 9, 2006, Gregory Levickas, M.D. stated that the claimant had several symptoms, including fatigue, myalgias, numbness, and tingling. Her symptoms started in March of 2002, and according to Dr. Levickas the claimant has been unable to work since November of 2003. She had undergone extensive testing with no clear diagnosis. First she was diagnosed with lyme [sic] disease then fibromyalgia. Dr. Levickas stated that the claimant's MRI showed extensive demyelinating process suspicious of multiple sclerosis, but a definitive diagnosis had not been made as of October 9, 2006. . . . Dr. Levickas stated that the claimant was clearly markedly symptomatic, [sic] and could not work (Exhibit 18F). Earlier on November 11, 2005, Dr. Levickas found that the claimant was disabled (Exhibits 16F and 17F). However, Dr. Levickas acknowledges no definitive objective evidence but states that the claimant is disabled. . . . (R. 29).

The ALJ then proceeded to list the following examples of evidence by which Dr. Levickas'

opinions were not supported and with which they were inconsistent:

- Radiographs that were "stable" and revealed rotatory levoscoliosis, no herniated nucleolus, no critical stenosis, "multilevel degenerative disc changes with a stable asymmetric disc bulge into the inferior left neural foramen at L4-L5 without nerve root impingement" (R. 29);

- Unremarkable January 22, 2004, CT scan of abdomen (R. 29);

- Normal bone density scan on January 20, 2004 (R. 29);

- A February 2004, physical capacity evaluation, completed by Dr. Levickas, that read Plaintiff could stand/walk from two-to-five hours per workday; sit from three-to-five hours per workday; drive for three-to-five hours in a workday; could occasionally lift and carry ten-to-twenty pounds; could frequently lift up to ten pounds; could frequently bend, squat, climb, kneel, twist, push, pull, reach, and stand; could use her hands for grasping and fine manipulation; could reach above shoulder level (R. 29);

- Dr. Levickas' March, 2004, opinion that Plaintiff could work for four hours per day (R. 30);

- Dr. Shaw's March, 2004, physical exam of Plaintiff, which was normal (R. 30);

- Dr. Shaw's May 16, 2005, opinion that Plaintiff was neurologically nonfocal despite a nonspecific memory loss and fatigue (R.30) and

- A state-agency physician's October 12, 2005, opinion that Plaintiff was limited to medium work, which included the ability to frequently balance, stoop, kneel, crouch, crawl; the ability to occasionally climb ramps and stairs; and the limitation to avoid concentrated exposure to extreme heat and cold, vibrations, and hazards (R. 30).

Dr. Levickas' opinions were not supported by this and other evidence of record. There were no diagnostic tests that support Dr. Levickas' claim that Plaintiff was unable to work. The ALJ reviewed and considered them – the normal abdominal CT scan; the radiographs that showed no herniated nucleolus, no critical stenosis, no nerve root impingement, and were stable; and the normal bone density scan (R. 29-30). The ALJ also noted that Plaintiff's April, 2004, lumbar puncture was normal (R. 28). The ALJ discussed and considered that Dr. Levickas' opinions were not supported by the findings of other physicians who treated Plaintiff for her symptoms. Dr. Shaw found Plaintiff's physical examination was normal in March, 2004; he opined that Plaintiff was "neurologically . . . nonfocal, despite a nonspecific memory loss and fatigue" (R. 30). The ALJ also considered the findings of Dr. Petri, who evaluated Plaintiff for fibromyalgia. Dr. Petri instructed Plaintiff to continue medicating with Ultracet, Effexor, and Naproxen and instructed her to stretch and engage in aerobic exercise daily (R. 28). The ALJ also considered Dr. Shaw's May 16, 2005, findings that Plaintiff had no shortness of breath, no abdominal pain, normal weight maintenance, no sicca features, no Reynaud's phenomenon, no mouth sores, no rashes. The ALJ also considered Dr. Shaw's finding that Plaintiff had "full range of articular movements with no sign of acute or chronic synovitis" (R. 29).

Most specifically, the ALJ found Dr. Levickas' opinion that Plaintiff was not able to work inconsistent with his own opinions. The ALJ referred to Dr. Levickas' February, 2004, opinion that Plaintiff could stand/walk from two-to-five hours per workday; sit from three-to-five hours per

workday; drive for three-to-five hours in a workday; could occasionally lift and carry ten-to-twenty pounds; could frequently lift up to ten pounds; could frequently bend, squat, climb, kneel, twist, push, pull, reach, and stand; could use her hands for grasping and fine manipulation; and could reach above shoulder level (R. 29). The ALJ also noted that Dr. Levickas had reported, on March 1, 2004, that Plaintiff could return to part-time work (R. 30).

In *Craig v. Chater*, 76 F.3d 585, 590(1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

[4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The ALJ evaluated Dr. Levickas' opinions in conjunction with *Craig*, id. She discussed the inconsistencies between Dr. Levickas' opinion that Plaintiff was disabled and the opinions of other medical providers and even Dr. Levickas' own opinions, and she evaluated the medical evidence of record to show that the opinions of Dr. Levickas were not supported thereby.

The ALJ relied on the state-agency physician in deciding Plaintiff's RFC. The Plaintiff, in her brief, noted, the ALJ "chose to accept the opinion of the non-examining D.D.S. medical consultant regarding the Plaintiff's functional restrictions" (Plaintiff's brief at p. 13). The ALJ did not err by relying on the opinion of the state-agency physician. 20 CFR § 404.1527(f)(2)(i) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists.

However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Plaintiff also argues that the ALJ failed to comply with 20 C.F.R. §404.1527, which requires the ALJ to consider and analyze an examining relationship, treatment relationship, supportability of medical opinion, consistency of opinions, and the type of opinion. As noted above, the ALJ did comply with this standard. She acknowledged the examining and treatment relationship Dr. Levickas had with Plaintiff; she determined that Dr. Levickas' opinions were not supported by medical signs and laboratory findings; and she evaluated the consistency of Dr. Levickas' opinions to the opinions of other doctors who evaluated, treated, or consulted with Plaintiff. Of those who offered opinions as to Plaintiff's limitations, Dr. Shaw is a rheumatologic expert and Dr. Petri is a physician who treats individuals with autoimmune diseases (R. 212, 125).

The Court further finds the opinion of Dr. Levickas relative to Plaintiff's disability is an issue reserved to the Commissioner because it is an administrative finding that is dispositive of a case. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(3)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(e)(1). Such opinions of Dr. Levickas cannot, therefore, be accorded controlling weight or even any special significance.

The undersigned finds the ALJ's decision as to the weight provided to the opinions of the treating physician is supported by substantial evidence.

## D. Credibility

Plaintiff asserts that the ALJ "failed to evaluate the Plaintiff's complaints of pain" (Plaintiff's brief at p. 16). Plaintiff further asserts the ALJ "totally discounted the Plaintiff's significant complaints as referenced not only in her testimony during the hearing but also in Plaintiff's" disability application documents (Plaintiff's brief at p. 17). Defendant asserts that the ALJ "considered all of the evidence – including the objective clinical signs and laboratory findings, medications, functional limitations, and Plaintiff's own testimony – before concluding that Plaintiff's statements concerning her impairments and the impact on her ability to work were not entirely credible" (Defendant's brief at p. 8).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see*

*id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594.

In her opinion, the ALJ found the following as required at step one of the *Craig* analysis: ". . . [T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements pursuant to Social Security Ruling 96-7p concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 28). Based on this assessment, the ALJ was required to then assess the intensity, persistence, and limiting effects that Plaintiff's symptoms had on her ability to work. To do that, the ALJ was required to consider and examine Plaintiff's medical history, medical signs and laboratory findings, objective medical evidence, Plaintiff's daily activities, and Plaintiff's statements.

The ALJ considered and evaluated Plaintiff's activities of daily living and statements. The ALJ considered Plaintiff's testimony at the administrative hearing. She noted Plaintiff testified her hands became numb and cold for twenty minutes a time, five days per week. She considered Plaintiff testified that she slept "a lot" and was "fatigued a lot." The ALJ also noted Plaintiff testified that she became "depressed because she" could not do "anything" (R. 27). Even though Plaintiff asserts in her brief that the ALJ did not consider Plaintiff's "complaints of pain, and in this case severe fatigue," the record establishes that she did (Plaintiff's brief at p. 16). The ALJ considered the February, 2002, statements of Plaintiff to Dr. Petri that she was chronically fatigued

and her October, 2003, statement that she "was almost crawling into work because her muscles were so weak." The ALJ also noted Plaintiff complained of fatigue and aching legs in 2004 to Dr. Levickas (R. 28). The ALJ considered Plaintiff's statements to Dr. Shaw that her fatigue was worse, she experienced weakness, and she had bruising behind her knees and ankles (R. 29).

The ALJ found these complaints were not supported by the evidence of record. Even though Plaintiff asserted that the ALJ did not consider her statements in the disability reports (Plaintiff's brief at p. 17), the ALJ did note that, in Plaintiff's disability Function Report, dated February 7, 2005, Plaintiff wrote that she could do "household chores," clean, do laundry, complete household repairs, iron, and mow grass. The ALJ noted Plaintiff walked, drove a car, shopped, used the computer, paid bills, read, cooked, and gardened (R. 26).

The ALJ considered the opinions and reports of various physicians who treated, consulted with, or examined Plaintiff, as they related to Plaintiff's complaints of pain. Dr. Petri, who had heard Plaintiff's complaints of weakness and fatigue and who had diagnosed Plaintiff with fibromyalgia, instructed Plaintiff to engage in a "stretching regimen, such as Tai Chi and have some aerobic exercise for her muscles on a daily basis" (R. 28).

The ALJ considered that Plaintiff's complaints of pain and limitations were not supported by Dr. Levickas' January 20, 2004, opinion that Plaintiff could stand/walk from two-to-five hours per workday; sit from three-to-five hours per workday; drive for three-to-five hours in a workday; could occasionally lift and carry ten-to-twenty pounds; could frequently lift up to ten pounds; could frequently bend, squat, climb, kneel, twist, push, pull, reach, and stand; could use her hands for grasping and fine manipulation; could reach above shoulder level (R. 29). The ALJ also noted that Dr. Levickas had reported, on March 1, 2004, that Plaintiff could return to part-time work (R. 30).

20

She noted that Dr. Levickas opined, in October 2006, that Plaintiff had undergone "extensive testing with no clear diagnosis." The ALJ considered Dr. Levickas' opinion that an "MRI showed extensive demyelinating process suspicious of multiple sclerosis, but a definitive diagnosis had not been made as of October 9, 2006." The ALJ considered that Dr. Levickas had written, on October 9, 2006, that Plaintiff was under the care of Dr. Royal as to her testing for possible multiple sclerosis; however, the record does not contain any evidence from Dr. Royal (R. 29).

The ALJ also considered the findings of Dr. Shaw as to Plaintiff's complaints of pain. She noted Dr. Shaw found Plaintiff's March 16, 2004, physical examination "generally normal" and that, in May, 2005, Plaintiff had "full range of articular movements with no sign of acute or chronic synovitis" and was neurologically nonfocal. The ALJ considered Dr. Shaw's January, 2004, direction to Plaintiff that she complete weight bearing exercised three times per week for twenty minutes per time. (R. 29).

In addition to considering Plaintiff's complaints of pain in light of the opinions of those physicians who treated or examined Plaintiff, the ALJ also considered the results of the laboratory findings and clinical studies as to Plaintiff. The ALJ noted Plaintiff's April 2004 lumbar puncture was normal; her January 22, 2004, abdominal CT scan was normal; Plaintiff's 2002 bone density scan was normal; and radiographs showed no herniated nucleous, no critical stenosis, a "stable" asymmetric disc bulge without "nerve root impingement (R. 28-29).

In addition to asserting that the ALJ erred in her analysis of Plaintiff's credibility, Plaintiff also asserts that the ALJ did not comply with SSR 96-7p, which mandates the following:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and

its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

. . . .

> 5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The ALJ did not make a single, conclusory statement relative to Plaintiff's complaints of pain and her credibility with regards thereto. The ALJ's decision contained specific reasons for finding the Plaintiff not credible. She considered and weighed Plaintiff's statements at the hearing, statements she made to physicians, answers to questions found in disability reports in conjunction with the opinions and diagnoses of physicians, the clinical laboratory findings, the objective medical evidence, her activities of daily living, and her own statements of what she could and could not do in determining Plaintiff was not entirely credible. As noted above, the ALJ found Plaintiff's complaints of pain were not supported by the January 22, 2004, radiographs, Dr. Shaw's finding that Plaintiff's physical examination was generally normal, Dr. Levickas' opinion that Plaintiff could perform light work or work part time, Dr. Petri's instructions to Plaintiff that she exercise and engage in strengthening training, Dr. Shaw's finding that Plaintiff had full range of articular movements and was neurologically nonfocal, and other evidence as discussed above (R. 28-30).

The undersigned finds the ALJ's decision as to Plaintiff's credibility is supported by

substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _6_ day of _November_, 2009.


_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

23